UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------x
MORRIS BUILDERS, L.P. a/k/a MORRIS :
INDUSTRIAL BUILDERS, L.P.; and MORRIS :
WESTCHESTER RETAIL ASSOCIATES, :
LLC, :
             Plaintiffs, :
v. : **OPINION AND ORDER**
 :
FIDELITY NATIONAL TITLE INSURANCE : 16 CV 9114 (VB)
COMPANY, FIRST AMERICAN TITLE :
INSURANCE COMPANY, and :
COMMONWEALTH LAND TITLE :
INSURANCE COMPANY, :
             Defendants. :
--------------------------------------------------------------x

Briccetti, J.:

    Plaintiffs Morris Builders, L.P. a/k/a Morris Industrial Builders, L.P. ("Morris"), and Morris Westchester Retail Associates, LLC ("MWR"), bring this action against defendants Fidelity National Title Insurance Company ("Fidelity"), First American Title Insurance Company ("First American"), and Commonwealth Land Title Insurance Company ("Commonwealth"), seeking declaratory relief and asserting a claim for breach of contract.

    Now pending are the parties' cross-motions for summary judgment. Plaintiffs move for summary judgment as to liability and as to plaintiffs' entitlement to certain forms of damages. (Doc. #140). Defendants cross-move for summary judgment as to liability and seek to dismiss this case in full. (Doc. #145).

    For the following reasons, plaintiffs' motion is DENIED, and defendants' cross-motion is GRANTED.

    The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332.

1

**BACKGROUND**

The parties have submitted memoranda of law, declarations with exhibits, and statements of undisputed material fact pursuant to Local Civil Rule 56.1, which together reflect the following factual background.[1]

The relevant facts are largely undisputed. At its core, this case concerns a dispute between a commercial real estate developer and its title insurers over whether those insurers are obligated to indemnify the developer for losses it claims resulted from a purported title defect affecting 2.36 acres of an approximately 60-acre site in Yonkers, New York. The parties refer to this site as the "Austin Avenue Site."

I.     History of the Austin Avenue Site

In 1955, Yonkers passed a local ordinance that set aside lots for park and playground purposes under the name "Hogan Park." Hogan Park was situated over three Yonkers tax lots, which the parties refer to as the "Park Lots." (See Doc. ##166 ("Pls.' Statement of Undisputed Material Facts ("Pls.' SUMF")) ¶ 7, 176 ("Defs.' SUMF") ¶ 12). In 1982, Yonkers passed a local law authorizing its City Manager to convey land which included the Park Lots to Westchester County (the "County") in exchange for $1.1 million.

Two years later, in August 1984, the New York State legislature passed an act authorizing Yonkers to "discontinue the use of and to convey" Hogan Park to either the Westchester Industrial Development Agency ("WIDA") or the Yonkers Industrial Development

---

[1] Unless otherwise noted, the facts are drawn from the parties' responses to each Statement of Undisputed Facts Pursuant to Local Rule 56.1 submitted with the respective motions. (See Docs. ##163, 176). References in this Opinion to the parties' Rule 56.1 Statements incorporate the record citations therein.

Agency ("YIDA") for "no consideration." (Doc. #87-12 (the "1984 Act") at ECF 2).[2] The 1984 Act took "effect immediately." (Id.). The Act also required Yonkers to set aside at least one acre of parkland for public use. (Id.)

In October 1985, Morris, Yonkers, Westchester County, WIDA, and YIDA entered into the "Five Party Agreement." Pursuant to this agreement, WIDA acquired parcels of land from Yonkers or the County—purportedly in fee simple. (Doc. #87-1 at ECF 3–5). The parcels WIDA acquired became the "Austin Avenue Site," which WIDA leased to Morris in a leasehold agreement executed at the same time. Later, in May 1989, the County executed a deed conveying to WIDA in fee simple land that included the Park Lots.

Between 1989 and 2011, Morris developed and subleased portions of the Austin Avenue Site to Costco, Home Depot, and Stew Leonard's, whose rents comprised the revenue Morris generated from the Austin Avenue Site.

II.     The Title Insurance Policy

On December 27, 1989, defendants issued a title insurance policy on 60-acres of the Austin Avenue Site (the "Policy").[3] Around the same time, Morris procured from defendants a title insurance policy covering WIDA's interest in the Austin Avenue Site. Morris paid all premiums required by the Policy.

---

[2]     "ECF" refers to page numbers automatically assigned by the Court's Electronic Case Filing system.

[3]     The parties bicker over whether the Austin Avenue Site, as so defined, included a plot of land known as "Current Lot 1." If the "Austin Avenue Site" is defined as containing "Current Lot 1," then the site is 85-acres. Without Current Lot 1, the site is 60-acres. (See, e.g., Pls.' SUMF ¶¶ 1, 17). But this dispute is immaterial because the parties stipulated that Current Lot 1 was not included in the insured leasehold, i.e., the portions of the Austin Avenue Site covered by the Policy. (Doc. #85 ¶ 4).

3

The parties have stipulated that an "NYBTU Form 100 D Revised Effective 1-1-63 Form 1089-1 Policy" was the form of title insurance defendants issued to Morris on December 27, 1989.  (Doc. #84 ¶ 1).

The Policy's preamble states defendants insure Morris "against all loss or damage . . . and . . . the costs and expenses of defending the title . . . which the insured shall sustain by reason of any defect or defects of title affecting the [insured leasehold], or affecting the interest of [the insured] therein."  (Doc. #84-1 (the "Policy") at ECF 2).  Importantly, however, the policy "except[s] all loss and damage by reason of . . . the conditions of this policy."  (Id.).

Several sections of the Policy's terms and conditions are at issue in this action.  First, Section 2, titled "Defense and Prosecution of Suits," provides:

> (a)  [Defendants] will, at [their] own cost, defend the insured in all actions or proceedings founded on a claim of title or incumbrance not excepted in this policy; [and]
>
> (b)  [Defendants] shall have the right and may, at [their] own cost, maintain or defend any action or proceeding relating to the title or interest hereby insured, or upon or under any covenant or contract relating thereto which [they] consider[] desirable to prevent or reduce loss hereunder.

(Policy § 2).

Second, Section 3 conditions "Cases Where Liability Arises," and provides:  "No claim for damages shall arise or be maintainable under the policy except . . ."

> (a)  Where there has been a final determination under which the insured may be dispossessed, evicted or ejected from the premises or from some part or undivided share or interest therein; [or]
>
> (b)  Where there has been a final determination adverse to the title, upon a lien or encumbrance not excepted in this policy;

(Policy § 3(a), (b)). And the Policy defines a "final determination" as "the final determination of a court of competent jurisdiction after disposition of all appeals or after the time to appeal has expired." (Id. § 1(c)).

Third, Section 5 provides for the "Payment of Loss," pursuant to which defendants "will pay, in addition to the loss, all statutory costs and allowances imposed on the insured in litigation carried by [defendants] for the insured under the terms of this policy." (Policy § 5(a)). However, it also provides that defendants "shall not be liable for and will not pay the fees of any counsel or attorney employed by the insured." (Id.).

Finally, Section 10 states defendants "may take any appropriate action under the terms of this policy whether or not [they] shall be liable hereunder and shall not thereby concede liability or waive any provision of this policy." (Policy § 10).

III.   The Prior Action

Until 2007, a plot of land known as "Current Lot 1" was included in Morris's leasehold of the Austin Avenue Site. For a time, Current Lot 1 was a landfill that Morris was unable develop. (See Doc. #147-14 ("Bava Dep.") at ECF 6–13). In 2007, Morris amended its lease with WIDA to exclude Current Lot 1 from the site. Defendants never insured Current Lot 1.

But in 2010, WIDA and YIDA proposed to convey Current Lot 1 to a local special needs school. Morris objected to the sale of Current Lot 1 for a variety of reasons, including that Morris sought to develop that land. (Bava Dep. at ECF 12–13).

Thereafter, in 2011, Morris conducted an investigation into the title of the Austin Avenue Site (including Current Lot 1), the Park Lots, and adjoining parcels. During this investigation, Morris discovered the purported title defect (the "Defect").[4] According to Morris, the Defect

---

[4]   The parties dispute whether there existed a title defect. Defendants do not dispute the facts that led Morris to believe a defect existed. But, for reasons explained below, defendants

5

stems from Yonkers's 1982 transfer of the Park Lots to the County for $1.1 million. Morris claims this transfer was unlawful under the public trust doctrine because it was not approved by an act of the State Legislature. (Doc. #147-15 at ECF 1–2). Under New York law, parkland and other land set aside for public use cannot be alienated absent a plain, direct, and specific authorization by the New York State legislature. See generally, e.g., Avella v. City of N.Y., 29 N.Y.3d 425, 431 (2017). And, according to Morris, the 1984 Act, which went into effect two years after the transfer, was not retroactive and only permitted Yonkers to transfer the Park Lots for "no consideration." (See 1984 Act at ECF 2; Doc. #147-15 at ECF 2). Therefore, Morris argues, Yonkers's 1982 transfer of the Park Lots to the County was defective.

The parties have stipulated that 2.36 acres of the 60-acre insured leasehold consisted of Park Lots affected by the Defect.

On September 26, 2011, Morris wrote a letter to defendants stating it believed there existed a title defect in both Morris's leasehold and WIDA's interest in the Park Lots. Defendants responded by letter on December 7, 2011, stating Morris had "adequately described a challenge to WIDA's interest in the Property as the fee holder. [And], there [was] a question as to whether [Morris] [had] standing to assert the described title challenge as to the Insured Property." (Doc. #147-16 at ECF 2–3). They also wrote that, "because there are facts and circumstances that could trigger [defendants'] duty to defend pursuant to the Policy, [defendants] will elect to take curative measures pursuant to Condition 3(c)." (Id.).

However, defendants also specifically "reserve[d] any and all rights and defenses they [had] under the [Policy]," and stated that "reference to any particular provision of the Policy [in

---

contest whether these facts rendered the relevant titles defective. For the purposes of brevity, clarity, and consistency, the Court describes the purported defect as "the Defect," but in so referring does not determine or rule that there existed a title defect during the time periods relevant to this action.

the letter] shall not be construed as a waiver of any other term or provision." (Doc. #147-16 at ECF 4–5).

By separate letter dated the same day, defendants advised Morris they had retained the Dorf Law Firm to represent Morris in taking curative measures with respect to the Defect. But on December 14, 2011, Morris replied that it did "not wish to retain or have the Dorf Law Firm represent us [on] the instant Claim," and instead requested that a different law firm be retained to address the Defect. (Doc. #147-20 at ECF 2–3). According to this letter, Morris wanted to retain the other law firm because Morris had claims against WIDA and YIDA not covered by the Policy, including for breach of the lease, the Five Party Agreement, and of the covenant of quiet enjoyment. (Id.). Moreover, Morris believed there was "a potential conflict of interest between [Morris] and Insurers," because Morris's "loss of possession and/or potential loss of possession of the property may not be recompensed by a subsequent return of the Property to [Morris], whereas the Insurers' interest appears to be solely related to the title defect." (Id. at ECF 3).

In March 2014, Morris commenced a lawsuit in this this district against WIDA, YIDA, the County, and Yonkers (the "Prior Action"). See Morris Builders L.P. v. County of Westchester et al., 14-cv-1866 (S.D.N.Y. Mar. 18, 2014). Morris asserted claims for breach of the Five Party Agreement and breach of the covenant of quiet enjoyment, and sought specific performance and a declaratory judgment. Morris also sought injunctions and other relief under New York state law regarding WIDA and the County's use and proposed sale of Current Lot 1. (See Doc. #142-15 at ECF 10–11). In addition, Morris sought a corrective deed for the Park Lots from Yonkers. (Id. at ECF 18–19).

Defendants retained counsel for WIDA in the Prior Action pursuant to the insurance policy on WIDA's interest in the Austin Avenue Site. And, in March 2015, WIDA filed an

amended answer denying Morris's allegations. (See Doc. #142-16). WIDA also asserted a cross-claim against Yonkers seeking a declaration that the Five Party Agreement required Yonkers to issue a confirmatory deed to "confirm WIDA's title in the Austin Avenue site and cure the alleged defects in the 1982 Deeds." (Id. at ECF 12).

Yonkers, YIDA, the County, and WIDA all denied that Morris or WIDA's titles were defective. (See Doc. #147-25).

While Morris was attempting to resolve the Prior Action, defendants sent several letters to Morris regarding an indemnification demand and a prospective settlement. For example, on March 28, 2016, Commonwealth wrote to plaintiffs' counsel that it believed the settlement reached at a mediation would "vest title in the disputed property in Morris, and the title issue [would] be cured." (Doc. #142-22 at ECF 2). And Commonwealth stated it "remain[ed] willing to engage in settlement discussions regarding reimbursement for reasonable attorney fees and costs incurred in that portion of the litigation directed to cure the title defect, only." (Id. at ECF 3). Commonwealth also refused to pay Morris for rent paid to WIDA because "[t]here has never been any evidence provided to [Commonwealth] that Morris was denied possession or use of the property." (Id.). Each defendant sent materially identical letters to Morris. (See Docs. ##142-23, 142-26, 142-27).

The Prior Action was eventually resolved by an Order and Stipulation of Settlement entered on June 27, 2016 (the "Settlement Order"). (Doc. #147-27). Pursuant to the Settlement Order, Morris purchased the land it formerly leased from WIDA, including Current Lot 1, for $32 million. In addition, the Order required Yonkers to execute and deliver to WIDA a "correction deed for the [Park Lots]." (Id. ¶ 6).

The Dorf Law Firm, which defendants had retained to represent Morris for the limited purpose of resolving the Defect, commented on and suggested revisions to the deed conveyed in connection with the settlement.

IV. The Target Development

On August 15, 2012, Morris and Target Corporation entered into a development lease agreement (the "Target Agreement"), whereby Target agreed to potentially sublease a portion of the Austin Avenue Site along with an "Expansion Parcel," which included a portion of Current Lot 1, for the development of a Target store. (Doc. #150-4). Morris's acquisition of the Expansion Parcel was a condition precedent for the Target project to move forward.

On December 19, 2012, counsel for Target sent Morris a title report issued by First American (the "Target Title Report"). (See Doc. #142-28 at ECF 2). In the Target Title Report, First American identified certain "exceptions" to the title, which First American would not insure "unless they are disposed of to the satisfaction of the Company." (Id. at ECF 13). Among the listed items was the "[t]erms, covenants, conditions and agreements contained in a lease [between WIDA] and [Morris]." (Id.). The report stated, "A copy of the aforementioned lease and any amendments thereto must be submitted to this Company for consideration prior to closing," and "WITH REGARD THERETO: . . . [First American] has been advised that pursuant to Chapter 833 of the Public Trust Doctrine enacted August 5, 1984, New York State Legislative approval to conveyances [from Yonkers to WIDA] was required, and not obtained." (Id.).

By letter dated February 20, 2013, Target's counsel demanded Morris cure the exception related to the Defect outlined in the Target Title Report. (Doc. #142-28 at ECF 29–30).

Before the court entered the Settlement Order in the Prior Action, on April 13, 2016, Morris and Target executed a lease amendment extending Morris's time to comply with certain

9

conditions precedent in the Target Agreement and providing for termination of the Target Agreement should certain conditions not be fulfilled by a set date.  (See generally Doc. #150-5).

In June 2016, plaintiff MWR was created to facilitate plaintiffs' purchase of the Austin Avenue Site.  MWR and Morris are affiliated through their overlapping beneficial ownership, but there is no legal relationship between the two entities.  MWR has never been insured under the Policy.

In connection with the Settlement Order, WIDA conveyed to MWR a parcel of land referred to as "New Lot 4," that, along with other parts of the Austin Avenue Site and Current Lot 1, satisfied the Target Agreement's Expansion Parcel condition.  Morris then assigned to MWR the Target Agreement.  (See Doc. #150-7).

However, approximately six months later, on January 3, 2017, Target terminated the Target Agreement.  Target explained the development could not move forward because Target had not received certain permits and approvals by the contractually-provided deadline of December 31, 2016.  Accordingly, under the 2016 amendment to the Target Agreement, MWR paid Target a break-up fee.

V.  Procedural History

Plaintiffs commenced this action in November 2016, seeking a declaration that the Policy obligates defendants to indemnify plaintiffs for certain costs incurred in the Prior Action and for damages that plaintiffs allege stem from the Defect.  Plaintiffs also brought a claim for breach of contract, asserting defendants failed to take curative measures, participate in the Prior Action,

10

indemnify plaintiffs for their legal fees and expenses, and indemnify plaintiffs for losses associated with the Defect.[5]

After a lengthy period of discovery and numerous attempts to resolve this case, the parties filed the pending motions. Plaintiffs move for partial summary judgment as to the existence of a title defect, the existence of a conflict of interest between Morris and defendants in the Prior Action, and plaintiffs' entitlement to certain forms of damages. Defendants seek summary judgment in their favor dismissing the action in its entirety.

## DISCUSSION

I.  Legal Standard

The Court must grant a motion for summary judgment if the pleadings, discovery materials before the Court, and any affidavits show there is no genuine issue as to any material fact and it is clear the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).[6]

A fact is material when it "might affect the outcome of the suit under the governing law . . . . Factual disputes that are irrelevant or unnecessary" are not material and thus cannot preclude summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

A dispute about a material fact is genuine if there is sufficient evidence upon which a reasonable jury could return a verdict for the non-moving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. at 248. The Court "is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried." Wilson v. Nw. Mut. Ins. Co., 625 F.3d 54, 60 (2d Cir.

---

[5] According to plaintiffs' opposition to defendants' motion, plaintiffs no longer assert defendants breached any duty to take curative measures. (See Doc. #161 (Doc. #161 ("Pls.' Opp. Br") at ECF 19–20).

[6] Unless otherwise indicated, case quotations omit all internal citations, quotations, footnotes, and alterations.

11

2010).  It is the moving party's burden to establish the absence of any genuine issue of material fact.  Zalaski v. City of Bridgeport Police Dep't, 613 F.3d 336, 340 (2d Cir. 2010).

If the non-moving party fails to make a sufficient showing on an essential element of its case on which it has the burden of proof, then summary judgment is appropriate.  Celotex Corp. v. Catrett, 477 U.S. at 323.  If the non-moving party submits "merely colorable" evidence, summary judgment may be granted.  Anderson v. Liberty Lobby, Inc., 477 U.S. at 249–50.  The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts, and may not rely on conclusory allegations or unsubstantiated speculation." Brown v. Eli Lilly & Co., 654 F.3d 347, 358 (2d Cir. 2011).  The mere existence of a scintilla of evidence in support of the non-moving party's position is likewise insufficient; there must be evidence on which the jury could reasonably find for it.  Dawson v. County of Westchester, 373 F.3d 265, 272 (2d Cir. 2004).

On summary judgment, the Court construes the facts, resolves all ambiguities, and draws all permissible factual inferences in favor of the non-moving party.  Dallas Aerospace, Inc. v. CIS Air Corp., 352 F.3d 775, 780 (2d Cir. 2003).  If there is any evidence from which a reasonable inference could be drawn in favor of the non-moving party on the issue on which summary judgment is sought, summary judgment is improper.  See Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc., 391 F.3d 77, 82–83 (2d Cir. 2004).

However, "when faced with cross-motions for summary judgment, a district court is not required to grant judgment for one side or the other.  Rather, the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration."  Heublein, Inc. v. United States, 996 F.2d 1455, 1461 (2d Cir. 1993).

And, in deciding a motion for summary judgment, the Court need only consider evidence that would be admissible at trial. Nora Beverages, Inc. v. Perrier Grp. of Am., Inc., 164 F.3d 736, 746 (2d Cir. 1998).

II. Breach of Contract Claim

Plaintiffs' request for declaratory relief and claim for breach of contract are materially identical. Plaintiffs seek a declaration that the Policy obligates defendants to indemnify plaintiffs for costs associated with curing the Defect and to compensate them for losses plaintiffs claim resulted from the Defect. Likewise, plaintiffs claim defendants breached their duties to indemnify plaintiffs for costs and attorneys' fees and to defend plaintiffs in the Prior Action.

A. Legal Standard

A title insurance policy "is a contract by which the title insurer agrees to indemnify its insured for loss occasioned by a defect in title." L. Smirlock Realty Corp. v. Title Guar. Co., 52 N.Y.2d 179, 188 (1981).[7] And like any other contract, "insurance contracts must be construed to give effect to the intent of the parties, as expressed in the plain meaning of the contract language." Sarinsky's Garage, Inc. v. Erie Ins. Co., 691 F. Supp. 2d 483, 485–86 (S.D.N.Y. 2010). "Since the title insurer's liability to its insured is based, in essence, on contract law, that liability is governed and limited by the agreements, terms, conditions, and provisions contained in the title insurance policy." Nastasi v. Cty. of Suffolk, 106 A.D.3d 1064, 1066 (2d Dep't 2013). "An exclusion from coverage must be specific and clear in order to be enforced, and an ambiguity in an exclusionary clause must be construed most strongly against the insurer." A. Gugliotta Dev., Inc. v. First Am. Tit. Ins. Co. of N.Y., 112 A.D.3d 559, 560 (2d Dep't 2013).

---

[7] When, as here, "[t]he parties' briefs assume that New York law controls, . . . such implied consent is sufficient to establish choice of law." Krumme v. WestPoint Stevens Inc., 238 F.3d 133, 138 (2d Cir. 2000).

13

"Under New York law, a breach of contract claim requires proof of (1) an agreement, (2) adequate performance by the plaintiff, (3) breach by the defendant, and (4) damages." Fischer & Mandell, LLP v. Citibank, N.A., 632 F.3d 793, 799 (2d Cir. 2011).

Moreover, "[s]ummary judgment is only proper in contract disputes if the language of the contract is wholly unambiguous." Lucente v. Int'l. Bus. Machines Corp., 310 F.3d 243, 257 (2d Cir. 2002). "Contract language is ambiguous if it is capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement." Sayers v. Rochester Tel. Corp. Supplemental Mgmt. Pension Plan, 7 F.3d 1091, 1095 (2d Cir. 1993). "Parties to a contract may not create an ambiguity merely by urging conflicting interpretations of their agreement." Id.

B.      Application

Plaintiffs argue defendants breached two duties under the Policy—the duty to indemnify and the duty to defend. Plaintiffs claim that, because there was a defect in Morris's leasehold, defendants were obligated to indemnify plaintiffs for costs associated with curing the defect, and are liable for failing to defend plaintiffs in litigation based on that defect.

Defendants, however, contest that a cognizable title defect existed at the time of the Prior Action. Thus, defendants argue they cannot be liable under the Policy. Defendants also argue that, even if there was a defect, they breached no duty imposed by the Policy.

No party argues the Policy is ambiguous. Accordingly, summary judgment turns on whether either party demonstrates there is no genuine dispute of material fact as to whether a title defect existed and, if a defect existed, whether defendants breached their duties to indemnify or defend plaintiffs under the Policy.

As explained below, the Court concludes no cognizable title defect existed at the time of Morris's investigation in 2011.  Accordingly, defendants breached no duty imposed by the Policy.  Because plaintiffs have failed to demonstrate a genuine issue of material fact as to an essential element of their claim, and it is clear defendants are entitled to judgment as a matter of law, the Court must grant summary judgment in defendants' favor.  See Celotex Corp. v. Catrett, 477 U.S. at 323.

1. Whether a Cognizable Title Defect Existed

The Policy insures against "all loss or damage . . . [including] the costs and expenses of defending the title . . . which the insured shall sustain by reason of any defect or defects of title affecting the premises."  (Policy at ECF 2 (emphasis added)).

Defendants argue no duty to indemnify or defend accrued under the Policy because, at the time plaintiffs notified them of the purported Defect in 2011, no cognizable title defect existed.

The Court agrees.

Under New York law "parkland is impressed with a public trust, requiring legislative approval before it can be alienated or used for an extended period for non-park purposes." Friends of Van Cortlandt Park v. City of N.Y., 95 N.Y.2d 623, 630 (2001); N.Y. General City Law § 20(2).  And "only the state legislature has the power to alienate parkland (or other lands held in the public trust) for purposes other than those for which they have been designated."  See Avella v. City of N.Y., 29 N.Y.3d 425, 431 (2017).  Such a grant of approval must be "plainly conferred" and "direct and specific."  See id.  Thus, for an alienation of parkland to be valid, "the proposed alienation must plainly fall within the scope of the legislative direction authorizing alienation of the parklands at issue."  Id. at 432.

15

Declaratory judgment claims brought under the public trust doctrine are ordinarily governed by the six-year statute of limitations provided for by N.Y. C.P.L.R. § 213(1).  See Matter of Shapiro v. Town of Ramapo, 98 A.D.3d 675, 677 (2d Dep't 2012); see also Solnick v. Whalen, 49 N.Y.2d 224, 229 (1980) (for claims without a specific statute of limitations, Section 213(1)'s six-year limitation applies).  And possible challenges to a title "[do] not constitute a defect in title where all action with respect thereto is barred."  See Lovell v. Jimal Holding Corp., 127 A.D.2d 747, 749 (2d Dep't 1987).

Plaintiffs argue the title to Morris's leasehold was defective in 2011 because Yonkers's alienation of the Austin Avenue Site to WIDA was not authorized by the New York State legislature, and therefore violated the public trust doctrine.

The Court disagrees.  At the time Morris purported to discover the Defect in 2011, the applicable statute of limitations had long since barred any claim challenging WIDA's title to the Park Lots and, by extension, Morris's leasehold.

Yonkers first transferred the Park Lots to the County in 1982.  Accordingly, any claim brought under the public trust doctrine challenging that transfer was barred as of 1988—more than 20 years before Morris notified defendants of the purported Defect.  At the latest, any claim might have accrued in 1985, when Morris's leasehold began.  But this means that, at the latest, no claim could have been maintained after 1991.  Because a claim under the public trust doctrine could not be brought after 1991, there was no title defect when Morris first notified defendants of the purported Defect in 2011.  See Lovell v. Jimal Holding Corp., 127 A.D.2d at 749.

Plaintiffs attempt to circumvent the statute of limitations by relying on Capruso v. Village of Kings Point, 23 N.Y.3d 631 (2014), in which the Court of Appeals applied the continuing wrong doctrine to toll the statute of limitations for a claim based on a municipality's ongoing use

16

of parkland for nonpark purposes. But because Capruso and its holding are inapplicable to this case, the Court is not persuaded.

In Capruso, members of the public challenged a village's proposal to deforest and construct a warehouse on a corner of parkland. The village claimed the challenge was time-barred because the village had been using that corner for nonpark purposes since 1946. The Court of Appeals disagreed and held the continuing wrong doctrine applies to the "ongoing use of parkland alleged to violate the public trust." Capruso v. Village of Kings Point, 23 N.Y.3d at 639. Specifically, the court concluded that the harm of the "municipality's ongoing failure to comply with the law and seek legislative authorization for nonpark use of parkland" did not "consist of the lingering effects of a single, discrete incursion, but rather [was] a continuous series of wrongs." Id. at 640. Because the plaintiffs' claim was "predicated on continuing unlawful acts and not on the continuing effects of earlier unlawful conduct," the statute of limitations was tolled. Id.

But Capruso is inapplicable because the Court of Appeals specifically did not decide the situation at issue here, which concerns "an allegation that a discrete event such as the sale of parkland to a private developer was in violation of the public trust doctrine." Capruso v. Village of Kings Point, 23 N.Y.3d at 641 (citing Matter of Shapiro v. Town of Ramapo, 98 A.D.3d at 677).

And this case involves exactly the kind of sale of parkland to a private developer that the Court of Appeals did not address in Capruso. In fact, this case is similar to Matter of Shapiro v. Town of Ramapo, 98 A.D.3d at 677. Matter of Shapiro concerned a challenge to a town's sale of real property to a private developer for a proposed development. The petitioners challenged the sale under the public trust doctrine, alleging the site was dedicated parkland alienated for

17

nonpark purposes. Id. at 676. But the Appellate Division found that "since petitioners commenced [the] proceeding . . . more than six years after . . . the Town Board . . . authorized the sale of the alleged parkland to [the developer]," that claim was time barred. Id. at 677.

Plaintiffs nevertheless argue Capruso controls this case, and, in any event, that Matter of Shapiro was decided before Capruso. Plaintiffs are wrong.

First, even though the Appellate Division decided Matter of Shapiro prior to the Court of Appeals' decision in Capruso, the Court of Appeals cited Matter of Shapiro favorably and specifically stated it "need not decide here whether the continuing wrong doctrine would apply" to a situation like the one at issue in Matter of Shapiro and here.[8] Capruso v. Village of Kings Point, 23 N.Y.3d at 641.

Moreover, this case is far more like Matter of Shapiro than Capruso. Yonkers's sale of the Park Lots to WIDA is nearly identical to the sale at issue in Matter of Shapiro because the transfer was a single, discrete event which could have been challenged in a timely fashion. WIDA's ownership and Morris's lease of the former parkland was not the continuing misuse of parkland by a municipality that refused to obtain legislative authorization to use the land for nonpark purposes. Instead, Yonkers's transfer was the alienation of parkland to a county development agency and its lease by a private developer.

Importantly, few of the concerns motivating the decision in Capruso apply here. In Capruso the Court of Appeals agreed "it would be unreasonable to expect ordinary citizens who

---

[8] Moreover, New York Courts have not uniformly applied the continuing wrong doctrine to cases founded on the public trust doctrine since Capruso was decided. For example, in Rural Community Coalition, Inc. v. Village of Bloomingburg, 127 A.D.3d 1304 (3d Dep't 2015), the Appellate Division did not apply the continuing wrong doctrine to a town's improper annexation of county land, and specifically rejected that Capruso applied because "the failure to conduct a secret ballot of residents on the annexation gave rise to a single, discrete wrong which could have been challenged in a timely fashion." Id. at 1305–06.

18

use parks to know whether a particular use by a municipality has received approval by the legislature." Capruso v. Village of Kings Point, 23 N.Y.3d at 641.  But here, Yonkers passed a local law authorizing the sale of portions of Hogan Park to the County.  And the New York State Legislature passed an act authorizing Yonkers's transfer of the Park Lots to WIDA.  These public pronouncements, and Morris's later development of the Park Lots with large grocery stores and shopping outlets, are far more open and discernible than a municipality's continued use of a corner of forested parkland for a pistol range and the storage of highway materials.  Cf. id. at 636–37.

In addition, an alienation like the one from Yonkers to WIDA does not have the effect of unlawfully excluding members of the public from land they are entitled to enjoy because the transfer of the Park Lots was concomitant with setting aside other parkland for public use.  (See 1984 Act at ECF 2).  In contrast, the municipality in Capruso held a portion of parkland for nonpark uses continuously from 1946 through 2009 without setting aside other land for public use.  See Capruso v. Village of Kings Point, 23 N.Y.3d at 637.

Accordingly, the continuing wrong doctrine does not apply to toll the statute of limitations.  Thus, there existed no cognizable title defect at the time of the Prior Action because the statute of limitations would have barred any challenge to WIDA's title and Morris's leasehold.  See Lovell v. Jimal Holding Corp., 127 A.D.2d at 749 (finding claim cannot "constitute a defect in title where all action with respect thereto is barred").  And because there was no actionable title defect in 2011, defendants did not breach any duty under the Policy, and summary judgment must be granted in defendants' favor.[9]

---

[9] Even if a cognizable title defect did exist, defendants would still be entitled to summary judgment because there is no genuine dispute of material fact with respect to whether defendants breached either of their duties to indemnify or defend under the Policy.  First, pursuant to Section 3 of the Policy, "[n]o claim for damages shall arise or be maintainable under the policy except . .

19

## CONCLUSION

Plaintiffs' motion for partial summary judgment is DENIED.

Defendants' cross-motion for summary judgment is GRANTED.

The Clerk is instructed to terminate the motions (Docs. ##140, 145) and close this case.

Dated: September 7, 2021
White Plains, NY

SO ORDERED:

_____
Vincent L. Briccetti
United States District Judge

---

. where there has been a final determination of a court of competent jurisdiction after disposition of all appeals or after the time to appeal has expired." Contrary to plaintiffs' contention, there is no record evidence demonstrating defendants admitted the existence of a title defect and thereby waived their right to contest liability under the Policy. In addition, there has been no "final determination" adverse to plaintiffs' leasehold because the Settlement Order is neither adverse to the leasehold nor could it eject or dispossess plaintiffs from the property. Accordingly, defendants have not breached their duty to indemnify plaintiffs. Second, Section 2(a) of the Policy obligates defendants to "at [their] own cost, defend the insured in all actions or proceedings founded on a claim of title or incumbrance." But plaintiffs themselves commenced the Prior Action and were at no point defendants in that case. Moreover, no party in that action asserted Morris or WIDA's title was defective or otherwise challenged the title. Accordingly, defendants did not breach their duty to defend Morris.

20